**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Jessica Robertine HARDY, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 17, 2007.

Filed Dec. 27, 2007.

Robert T. Panowicz, Wilkes–Barre, for appellant.

David W. Lupas, Asst. Dist. Atty., for Com., appellee.

BEFORE: STEVENS, DANIELS, JJ., and McEWEN, P.J.E.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence of 36 to 72 months' imprisonment after Appellant pled guilty to eight of twelve counts in an Information alleging she used her position as President and Chief Executive Officer of the Northeast Pennsylvania Chapter of Make–A–Wish Foundation, a charitable organization committed to granting the wishes of seriously

ill children, to defraud the charity out of nearly $56,000.00 over the course of ten years. According to the affidavit of probable cause against her, Appellant would carry out her scheme by referring a fictitious "Wish Child" to Make–A–Wish through a referral form and forge a physician's signature verifying the child's illness. She would then divert the foundation's gift to herself, and conceal the transaction with more false documents. Herein, Appellant raises several challenges to the discretionary aspects of her sentence. We affirm.

¶ 2 Presiding over Appellant's January 16, 2007 sentencing hearing was the Honorable Peter Paul Olszewski, Jr. of the Court of Common Pleas of Luzerne County. Before Judge Olszewski announced the sentence of the court, two high ranking officers of the Make–A–Wish Foundation of Greater Pennsylvania and Southern West Virginia–Regional Manager Lynn Hill from Luzerne County and President and CEO Judith Stone from Pittsburgh–testified to the adverse consequences that Appellant's highly publicized arrest and convictions had on fundraising.

¶ 3 Ms. Hill explained that her task of regional fundraising and coordinating special events became more difficult after news of Appellant's alleged fraud. "It has made past donors and potential donors hesitant. It's made them lose confidence in the organization. It's made them hesitant in giving and that I have lost their trust and it's been very difficult.... [I have had to answer questions regarding this case] on a continual basis." N.T. 1/16/07 at 11–12. On cross-examination, Ms. Hill confirmed defense counsel's speculation that fundraising had probably begun to improve as Appellant's case neared resolution, but with the qualifier that "after everything [that] has happened, we can only—it can only get better." N.T. at 13.

¶ 4 Ms. Stone testified about the case's statewide, and even national, effect. She spoke of "a loss of confidence. It ... took us 25 years to get the reputation that we had where people that would trust ... spending their volunteer time, giving their money, trusting us with their children to do their wishes. This has pretty much put a damper on that all the way through the organization." N.T. at 14–15. Stone did relate, however, that one cannot quantify the loss precisely, as it is impossible to tabulate how many would-be volunteers, donors, and referrals decided not to invest their trust in the charity as a result of Appellant's case. On cross-examination, defense counsel sought to develop further the speculative nature of what loss, if any, Make–A–Wish actually experienced on a national scale. Ms. Stone again admitted the impossibility of a concrete, dollars and cents answer, but offered that CEOs of chapters as far away as Texas had reported receiving "a lot of calls" from people now concerned about Make–A–Wish's ability to safeguard charitable contributions from fraud. N.T. at 17.

¶ 5 The last witness called, Mr. William O'Boyle, a former board member of Northeast Pennsylvania's chapter, gave his impression of the case's local consequences. He believed Appellant had caused much concern in the community along with great harm and embarrassment to the current board and everyone else associated with the foundation. N.T. at 20. When asked what sentence fit the crime, O'Boyle shared wisdom imparted at a past fundraiser by an 18 year old terminal cancer patient who, nearing the end of his life, spoke eloquently on the value of time. O'Boyle said "I think, Your Honor, maybe Miss Hardy needs to respect the value of time. Maybe the more time she has to think about that, maybe the better off she will be." N.T. at 21.

¶ 6 Accepting the court's offer to respond to anything offered by the witnesses, defense counsel argued the court should not consider "that kind of sympathy" generated by Mr. O'Boyle's account of a Wish Child, lest the sentence reflect revenge instead of justice. N.T. at 23. Counsel offered no other objection or comment to the testimony given.

¶ 7 With closing remarks completed, the court reviewed the facts bearing on the determination at hand.

THE COURT: Okay. These types of sentences and sentencings are difficult— at least, they're difficult for me-and I have no qualms in saying that publicly. Sentencing in crimes involving violence to individuals or to the community, seem to come more easily. Miss Hardy is not a violent criminal defendant. She's a graduate of Coughlin [High School]. She's a graduate King's College.

I have read approximately 20 letters that have been written on your behalf from family members and friends of yours and classmates of yours and acquaintances of yours who in their letters ask me for leniency and to impose a sentence without incarceration.

I have no doubt about the sincerity of those people. I have no doubt that they know you as they say they know you. I have no doubt that you've been a good person to them and to members of their family, families.

From reading the presentence investigation and from listening to Mr. Panowicz [defense counsel], I have no doubt that you have made significant efforts to be a good mother to your son. All of those things certainly are in your favor and weigh upon me in imposing the particular type of sentence.

On the other hand, I obviously have read in detail the presentence investigation which details in great length essentially the Probable Cause Affidavit which details the intricacies of your deceit.

I am not led to believe in any way, shape or form that had law enforcement not become involved, that you would have stopped. If there was no investigation, your actions may well be continuing through today.

I pointed out to you what was said in the presentence investigation about your comments to the probation Office, and specifically, the Probation Officer quoted you and indicates in the PSI that you show a lack of remorse. [1]

While you certainly articulated today words that would, would create a perception of remorse and being sorry for what you did, I don't buy them and I

---

1. (footnote not in original). At the outset of the sentencing hearing, the court responded to Appellant's expression of remorse as follows:

"Well, you know, you tell me today that you're remorseful; but when I read the presentence investigation and when I read what you told the probation officer, your statements to the probation officer are anything but remorseful.

You essentially told the probation officer that the reason you plead guilty is not because you're remorseful, not because you accept responsibility, but because you had no witnesses to help you at trial and there was nothing better to do.

That doesn't sound like remorse to me. Let me read [your statement] to you....

'As the Executive Director, I was charged with falsifying records and receiving property intended for the alleged Wish Children. Property was confiscated at my home and charges were filed. My case boiled down to "hearsay" evidence, when both my mother and her companion who could or would have testified on my behalf both died waiting for the case to be called. I felt that it was in the best interest of everyone, including myself, to plead guilty.'

Does that sound like remorse to you?" N.T. at 8–9.

don't think you're remorseful. I think you are upset and afraid of this proceeding, and I think that your words are meant to soften a sentence as opposed to genuinely convey the feelings of your heart.

I obviously learned for the first time today from Miss Hill and Miss Stone about the effect that your crimes have had, not only—and I'm .saving Mr. O'Boyle for a moment-upon the local Chapter, but the effects that your actions have had on Make–A–Wish throughout the Commonwealth of Pennsylvania and throughout the Country and that causes me great concern.

I also value greatly the comment by Mr. O'Boyle when he tells me about the negative impact this case had on the individual Board members. Having been a Board member of a variety of organizations . . ., [I know] Board members need energy to do the things that they do for the Board. They need to rely on that energy and they need enthusiasm to do positive things for the Boards they sit on. When Mr. O'Boyle tells me that there's been a negative impact on the energy and the enthusiasm of Board members, that causes me concern.

It's very difficult in white collar cases in my judgment-at least I speak for myself, and I don't speak for any other member of the Bench. It causes me difficulty to find a proper and just balance between the rehabilitative needs of a Defendant versus effectuating the goals of the Sentencing Code and evaluating the needs of the community.

It's painful for me to send a college graduate who has been an Executive Director of an organization such as this to prison. I don't want to do that.

At the same time, however, philosophically, I believe, that the sentencing of white col[la]r criminals isn't solely about making restitution for the money they stole.

Whether you ultimately can pay the restitution that's owed to this organization or not, is in question. Most Defendants can't.

Most Defendants don't. That's why they stole in the first place. They don't have the financial resources that they want.

Mr. Panowicz, early in his statement, indicated there's been a lot of publicity and public clamor about this case. This case should cause members of the public to talk.

I want you to know, however, that I hear no public clamor about the type of sentence to impose or any type of undue influence on the type of sentence that your client will receive.

Mr. Panowicz stated you wanted to . . . give things to your son and perhaps that you gave in excess. I don't know your son . . . but a 25–year old son is a man who should be working and trying to get the things he needs in life based upon what he can do for himself.

So, with all of that said, the sentence of the Court is as follows . . . .

N.T. at 23–28.

¶ 8 To a standard range Theft by Deception sentence of 12 to 24 months' imprisonment, the court ran each of six aggravated range Forgery[2] sentences of 4 to 8 months' imprisonment consecutively, resulting in an aggregate sentence of 36 to 72 months' imprisonment. The court enumerated eight reasons for the aggravated

2. The standard range Forgery sentence for each count was probation to 1 month incarceration.

range, aggregate sentence. Included were the unique hardship suffered by the victims, the insufficiency of the Sentencing Guidelines' standard range under these circumstances, Appellant's lack of remorse, Miss Hill's report of local fundraising difficulties and a general loss of public trust, Miss Stone's report of statewide and national fundraising difficulties, the heightened need for social justice and general deterrence against future white collar crimes against charities, and Mr. O'Boyle's report of demoralized Board members whose energetic and enthusiastic volunteerism the charity desperately needs. N.T. at 30–32.

¶ 9 It was at this time that defense counsel objected to the court's decision to factor alleged hearsay testimony on the widespread organizational effects of Appellant's conduct. After reminding counsel that he had failed to object when the testimony was given, the court clarified that the sentence encompassed a "plethora" of other factors which it outlined. It also doubted counsel's hearsay objection on the merits, as it found that Ms. Hill and Ms. Stone each testified from her personal knowledge. N.T. at 35.

¶ 10 On February 20, 2007, the court conducted a hearing on Appellant's Post–Sentence Motion, in which Appellant argued her sentence was markedly greater than those received by similarly situated defendants in other cases. When pressed by the court to explain how the particular facts and circumstances of the other cases were similar, defense counsel could only verify that the charges were similar. Counsel therefore confined his argument to the proposition that similar charges merit similar sentences presumably standard range and concurrent sentences. The court rejected this proposition has having no basis in authority.

¶ 11 Addressed thereafter were the Motion's other two issues challenging the court's determination that Appellant lacked remorse and its use of alleged hearsay testimony in fashioning a sentence. The court reasserted its role as the exclusive evaluator of witness credibility, and stood by its decision that Appellant was not truly remorseful for her crimes. As for the hearsay challenge, the court voluntarily withdrew Ms. Hill's and Ms. Stone's testimony as sentencing factors without conceding Appellant's point on the merits:

> THE COURT: It's not being considered by me in my sentence; and given that it's not considered, I still choose not to modify my sentence. And I further believe that there are more than ample reasons given of record at the time of sentencing to support the sentence imposed.

N.T. 2/20/07 at 10. With that ruling, the hearing drew to a close. This timely appeal followed.

¶ 12 Appellant raises three issues for our review:

I. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING THE DEFENDANT TO AN AGGREGATE SENTENCE OF THIRTY–SIX MONTHS TO SEVENTY–TWO MONTHS.

II. WHETHER THE SENTENCE WAS DISPROPORTIONATELY HARSH IN RELATION TO OTHER SENTENCES IMPOSED FOR SIMILAR TYPES OF CRIMES?

III. WHETHER THE TRIAL COURT'S FACTUAL FINDING THAT THE MAKE–A–WISH FOUNDATION WAS NEGATIVELY IMPACTED AND THUS CONSTITUTED AN AGGRAVATING FACTOR VIO-

LATED THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO TRIAL BY JURY?

Brief for Appellant at 3.

■■■ ¶ 13 Our standard of review in an appeal from the discretionary aspects of a sentence is well settled:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa.Super.2006) (citation omitted). "When imposing a sentence, the sentencing court must consider the factors set out in 42 [Pa.Cons.Stat.Ann.] § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant...." *Id.* Furthermore, "[a] trial court judge has wide discretion in sentencing and can, on the appropriate record and for the appropriate reasons, consider any legal factor in imposing a sentence in the aggravated range." *Commonwealth v. Stewart*, 867 A.2d 589, 593 (Pa.Super.2005)

(citation omitted). The sentencing court, however, must also consider the sentencing guidelines. *See Fullin*, 892 A.2d at 847.

■■■ ¶ 14 Having conducted a careful review of the record, party briefs, and applicable authority relating to both discretionary aspect and Sixth Amendment [3] challenges to sentencing, we discern no infirmity with Appellant's sentence. Ample factors apart from the contested testimony, which is excluded only for argument's sake, existed to support the aggravated range, aggregate sentence in her case. Indeed, Appellant exploited a high appointment of trust to profit from the misery of our most desperate and the charity of our most generous. She repeatedly did so for nearly ten years. To now denounce, as she does, a sentence tailored to the disturbingly chronic and egregious nature of her criminal scheme is to ask this Court to ignore context and instead review her charges in a vacuum, where only the name of the offense and corresponding standard range sentence is considered. Grounded in neither specific legal authority nor general principles of sentencing fairness, Appellant's appeal is utterly devoid of merit. This being so, and because the comprehensive opinion of Judge Peter Paul Olszewski, Jr. capably addresses and rejects each issue raised

---

**3.** Appellant constitutional challenge invokes *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and its progeny, which hold a determinate sentencing scheme permitting a judge to increase a sentence based on a fact neither admitted in a guilty plea nor proven beyond a reasonable doubt violates the defendant's Sixth Amendment rights. This is so because the determinate scheme restricts a judge's discretion to depart upward from a standard guideline sentence to such a degree as to make the guideline the effective "legal maxi-

mum" sentence. This Court has held, however, the *Blakely* line of cases has no application in Pennsylvania because we follow an indeterminate sentencing scheme. *Commonwealth v. Bromley*, 2004 PA Super 422, 862 A.2d 598 (Pa.Super.2004). An indeterminate scheme does not delineate legal maximum sentences but, instead, simply sets forth advisory sentences from which a judge may depart after exercising his or her discretion based on sentencing facts proven by a preponderance of the evidence. *See Commonwealth v. Kleinicke*, 895 A.2d 562 (Pa.Super.2006) (en banc).

herein, we incorporate his opinion in reaching our decision.

¶ 15 Judgment of sentence is affirmed.

¶ 16 McEWEN, P.J.E., Concurs in the Result.