J-A22020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICKLE JOE SHAFFER | |
| Appellant | No. 111 MDA 2016 |

Appeal from the Judgment of Sentence December 9, 2015
In the Court of Common Pleas of Franklin County
Criminal Division at No(s): CP-28-CR-0000264-2014

BEFORE: GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.                    **FILED OCTOBER 28, 2016**

Appellant, Mickle Joe Shaffer, appeals from the judgment of sentence entered after a jury found him guilty of third-degree murder. Shaffer raises eight separate challenges to the judgment of sentence. After careful review, we affirm.

On Christmas Eve 2013, Shaffer hosted a small party at his rural mobile home. One of his guests, Mary Jane Hinton, was selling cocaine to other attendees through the night. Around 3 a.m. Christmas morning, Hinton's supplier, Terry Fulton, arrived at the party, intending to sell more cocaine to Hinton.

Another attendee, Darius Spoonhour, had previously entered into a conspiracy with Janoris Hughes to rob Fulton and other attendees. Upon

overhearing Hinton contact Fulton, Spoonhour contacted Hughes to alert him to Fulton's imminent arrival at the party.

Shortly thereafter, Shaffer opened the door to his back porch and was greeted by Hughes holding a gun to his face. Hughes informed Shaffer that "this is a robbery." Hughes escorted Shaffer back into his home at gun point, and herded the attendees into a back room, ordering them to strip and hand over their valuables.

At this point, Fulton physically engaged Hughes and attempted to wrest the gun away. The struggle moved back into Shaffer's living room. Ultimately, Hughes ended up standing over Fulton and shot him three times. Hughes subsequently fled the residence without his gun.

Fulton left the premises to seek medical attention, but Spoonhour retrieved Hughes's gun. Shaffer took the weapon from Spoonhour and made two discoveries. First, that the gun was empty. Second, that he had ammunition that would fit the gun. At this point, none of the victims had made any attempt to contact authorities.

Shaffer reloaded Hughes's gun and went outside to search for Hughes. After this first sweep was unsuccessful, he returned to his home. Still no attempt was made to contact authorities regarding the attempted robbery. After approximately 30 minutes, Shaffer made a second sweep of his property.

During this second search, Shaffer found Hughes hiding in Spoonhour's car. Hughes exited the car under gunpoint. When Hughes attempted to flee to a nearby treeline, Shaffer fired one to three shots at him. Hughes was struck once in the back, suffering a fatal wound.

The Pennsylvania State Police ultimately charged Shaffer with homicide and several other crimes. A jury then convicted Shaffer of third-degree murder, and acquitted him on the remaining charges. The trial court imposed a sentence of imprisonment of 20 to 40 years. Shaffer's post-sentence motions were denied, and this timely appeal followed.

On appeal, Shaffer raises eight issues. In his first three issues, he challenges the trial court's refusal to instruct the jury on issues such as citizen's arrest and the use of deadly force to prevent the escape of a fleeing felon. After reviewing the briefs of the parties, the record, and the relevant law, we conclude that the Honorable Carol L. Van Horn's opinion thoroughly and completely addresses these issues. *See* Trial Court Opinion, 4/6/16, at 6-10 (finding that the passage of time between the robbery and the shooting negated the requirement of fresh pursuit for the requested instructions). We adopt this reasoning as our own and conclude that Shaffer is due no relief on his first three issues.

In his fourth and fifth issues, Shaffer argues that the trial court erred in restricting his cross-examination of Spoonhour. In particular, Shaffer contends that he was prevented from fully exploring the plea agreement

Spoonhour reached with the Commonwealth in return for his testimony in this matter. Once again, we conclude that Judge Van Horn's opinion fully and adequately addresses the issues raised by Shaffer. **See id**., at 10-22 (finding that Shaffer was not prevented, in any meaningful sense, from presenting the content and surrounding circumstances of Spoonhour's plea agreement with the Commonwealth). We therefore adopt this reasoning as our own and conclude that Shaffer's fourth and fifth arguments merit no relief.

In his sixth issue, Shaffer contends that the trial court erred in failing to conclude that he was entitled to a self-defense instruction based solely upon the evidence presented by the Commonwealth in its case-in-chief. Judge Van Horn's opinion once again thoroughly addresses the issue. **See id**., at 23-26 (concluding that the testimony in the Commonwealth's case did not support a finding that Shaffer shot Hughes pursuant to a reasonable fear of imminent serious bodily injury). We adopt Judge Van Horn's reasoning and conclude that Shaffer is due no relief on his sixth issue.

Next, Shaffer argues that the trial court erred in refusing his request to present evidence of Hughes's parole status at the time of the robbery. Shaffer contends that this information was critical in establishing that Hughes was the aggressor. Judge Van Horn's opinion fully and adequately addresses this issue, and we therefore adopt her reasoning as our own. **See**

*id*., at 26-27 (finding that this issue was a collateral matter and that in any event, Shaffer was not prejudiced by this exclusion).

In his eighth and final issue, Shaffer challenges the discretionary aspects of the sentence imposed by the trial court. Judge Van Horn thoroughly reviews the factors she considered and the reasoning she announced at sentencing that support the sentence imposed. ***See id***., at 27-31 (noting that she reviewed a pre-sentence report and imposed a standard range guideline sentence). We adopt this reasoning as our own and conclude that Judge Van Horn did not abuse her discretion in imposing sentence.

After reviewing the issues on appeal, we affirm the judgment of sentence on the basis of Judge Van Horn's well-written opinion.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/28/2016

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF
PENNSYLVANIA - FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | Criminal Action |
| | : | |
| vs. | : | No. 264-2014 |
| | : | |
| Mickle Joe Shaffer, | : | |
| Defendant | : | Honorable Carol L. Van Horn |

## STATEMENT OF THE CASE

On November 19, 2015, a jury found the above captioned Defendant, Mickle Joe

Shaffer guilty of third-degree murder.[1] The Defendant was sentenced on December 9,

2015, to 20 to 40 years of incarceration in a State Correctional Institution. On December

21, 2015, Defendant filed a timely Post-Sentence Motion to Modify Sentence. This Court

denied the Motion on December 23, 2015, stating that ". . . [t]he Court articulated its

reasons for the sentence imposed on the record at the time of sentencing and considered

the factors raised in this Motion at the time of sentencing." Order 12/13/15. Defendant

filed his Notice of Appeal on January 19, 2016, and his Concise Statement of Errors

Complained of on Appeal on February 1, 2016. The Court will now respond to

Defendant's claims of error in this Opinion and Order of Court pursuant to Pa.R.A.P.

1925(a).

## BACKGROUND

The incident in question began in the afternoon of Christmas Day 2013, and

continued into the early morning hours of December 26, 2013. On the dates in question,

the Defendant was at his mobile home located at 1069 Mount Sedonia Road, Fayetteville,

Pennsylvania. A number of other individuals were also present at the Defendant's mobile

---

[1] 18 Pa. C.S. 2502(c).

2

home on this night including Darius Spoonhour, Terry Fulton, Daniel Eshelman, Mary Jane Hinton, Shanice Prowell and Mike Llewellyn. At around 4:30 a.m. on December 26, 2013, Janorris Hughes, ultimately the victim in this case, approached the mobile home with a rifle. Hughes entered the residence and ordered all of the individuals present to the back of the home at gun point. Soon after doing so, Hughes was rushed by Terry Fulton and a scuffle ensued. Terry Fulton was shot multiple times but was able to gain possession of the gun. Hughes then fled the residence

Terry Fulton was able to reach his vehicle and drove off in an attempt to seek medical attention. However, prior to his departure, Darius Spoonhour was given the rifle. Unbeknownst to the other individuals, Darius Spoonhour was actually a co-conspirator in the botched robbery and had been texting Hughes just moments before he entered the mobile home. At trial, Spoonhour testified that his cell phone had subsequently died and he was therefore no longer able to communicate with Hughes. Spoonhour eventually turned over the weapon to the Defendant who subsequently discovered he had .22 caliber shells in his home. The Defendant then loaded precisely 8 to 10 bullets into the gun. At no point during this time period did any of the individuals present notify law enforcement.

Armed with the gun and a spotlight, the Defendant conducted a sweep of the perimeter outside his home in search of Hughes. The Defendant was unable to locate Hughes and reentered his home. Approximately 15 to 30 minutes had elapsed since Terry Fulton had given the gun to Spoonhour and driven off. Once again, none of the individuals contacted authorities. Defendant subsequently performed a second search of the area outside his mobile home and located Hughes hiding near the vehicles on the

3

property. In an attempt to flee, Hughes ran up a small incline away from the Defendant's property. The Defendant fired a single shot that hit Hughes in the back and ultimately killed him.

At trial, Defendant presented a justification defense, arguing that he shot Hughes in self-defense. In its case in chief, the Commonwealth called a total of thirteen witnesses. Notable among them were Darius Spoonhour and Daniel Eschelman. The Defendant took the stand and testified in his defense. Unconvinced, the jury convicted the Defendant of third-degree murder.

## ISSUES RAISED

Defendant raises the following issues in his Concise Statement:[2]

1. The Honorable Trial Court abused its discretion and committed reversible error by refusing to charge the jury on the issue of citizen's arrest, which was fully supported by evidence of record, particularly by Defendant's own testimony, and which, if accepted by his jury, would have constituted an absolute defense to the homicide charge.

2. The Honorable Trial Court abused its discretion and committed reversible error by refusing to charge the jury on the use of deadly force to prevent the escape of a fleeing felon, which was fully supported by evidence of record, particularly by Defendant's own testimony, and which, if accepted by his jury, would have constituted an absolute defense to the homicide charge.

3. The Honorable Trial Court abused its discretion and committed reversible error by refusing to charge the jury on the use of deadly force to prevent the escape of an arrested person in custody, which was fully supported by evidence of record, particularly by Defendant's own testimony, and which, if accepted by his jury, would have constituted an absolute defense to the homicide charge.

---

[2] Concise Statement of Errors Complained of on Appeal, 2/1/16.

4

4. The Honorable Trial Court abused its discretion and committed reversible error in unreasonably restricting the cross-examination of Darius Spoonhour, the prosecution's chief witness, especially as to the terms of his deal with the Commonwealth and the fact that he gave his own gun to a convicted felon, which was critical to challenging his credibility before Defendant's jury.

5. The Honorable Trial Court abused its discretion and committed reversible error in unreasonably restricting the cross-examination of Darius Spoonour's attorney, particularly as to the terms of his client's deal with the Commonwealth and the details of his representation of him at Defendant's trial, which was critical to challenging Spoohour's credibility before the jury.

6. The Honorable Trial Court abused its discretion and committed reversible error by effectively compelling Defendant to testify at trial against his own desires because the Court had ruled wrongly that insufficient evidence had been adduced in the Commonwealth's case to warrant a self-defense instruction to the jury, thereby violating Defendant's state and federal constitutional right against self-incrimination.

7. The Honorable Trial Court wrongly excluded the Defense request to have information from the Pennsylvania Board of Probation and Parole presented to Defendant's jury to the effect that decedent was on parole for burglary at the time of the incident, which was critical evidence for the jury to considering in weighing Defendant's defense of self claims, particularly whether decedent was the aggressor and thereby bolstering Defendant's assertion that he was reasonably in fear of death or serious bodily injury when he shot him.

8. Sentencing Defendant to the statutory maximum sentence of 20 to 40 years' incarceration for Third-Degree Murder constituted an abuse of discretion, too harsh a punishment and a manifestly excessive sentence under all the circumstances attendant to this unique

5

case, and the Sentencing Court failed to consider the important mitigating factors of record while focusing exclusively on the severity of the offense in violation of the Sentencing Code.

## DISCUSSION

### I.  Requested Jury Instructions

In his first three issues, Defendant contends this Court abused its discretion and committed reversible error when it refused to charge the jury on various instructions he requested. Because the request for these three instructions are inherently intertwined with one another, we will address them together. Initially, Defendant alleges that this Court committed reversible error by refusing to charge the jury on citizen's arrest. He contends that this instruction was proper and supported by evidence at trial, particularly his own, and if accepted by the jury would have constituted an absolute defense to the charge of third-degree murder. Because the Defendant believes he properly executed a citizen's arrest he argues the jury should have also been instructed on the use of deadly force to prevent the escape of a fleeing felon. Additionally, Defendant asserts that the Court should have granted his request to have the jury charged on the use of deadly force to prevent the escape of an arrested person in custody.

Regarding the Defendant's requests for the Court to charge the jury on these instructions, the following was placed on the record at the conclusion of trial:

> MR. FOSTER: Okay. Your Honor, I want to note for the record my exceptions to the Court's failure to charge the requested charges for citizen's arrest.
>
> . . .
>
> THE COURT: Well, your reason should be

6

stated on the record, because we do not have a record of why you wanted that charge to be added.

MR. FOSTER: I would ask--accept to the Court's failure to charge the requested charge which we entitled citizen's arrest, use of deadly force to make a lawful arrest. And, I will just tell you that I believe that the circumstances and the evidence that were introduced through the Commonwealth's case and the defendant's case would be sufficient to give rise to this charge.

The Court: Okay. Does the Commonwealth wish to place anything on the record?

Commonwealth: The Commonwealth disagrees with that theory and objects to the charge.

The Court: And, the Court is placing the ruling on the record now, that I previously advised counsel. I do not find that circumstances were presented at trial to justify the giving of this charge, relying on the case provided by the defendant, Commonwealth versus Chermansky, which I note is a 1968 case. There's not much law on this subject. The Court there noted that before the use of deadly force is justified, the private person must be in fresh pursuit the felon and also must give notice of his purpose to arrest for the felony, if the attending circumstances are themselves insufficient to warn the felon of the intention of the pursuing party to arrest him. I do not find that the circumstances meet this requirement.

N.T. 11/19/15 at 86, 91-92. The Defendant then noted on the record his reasons for

disagreeing with the Court by stating:

Mr. Foster: Okay. I believe he did not have to announce his intention to arrest because I think the circumstances made it clear that Mr. Hughes was aware of what the circumstances were that made him feel he was being placed under arrest and I believe it is still sufficiently fresh pursuit for the jury to make that determination, as opposed to the Court, because it was the intuition of the incident and the defendant found Mr. Hughes still on his property, right outside of his door after he committed this grievous felony.

7

My next exception is, if they were given the charge, citizen's arrest, use of deadly force to prevent escape of fleeing felon. And again, I just believe that the evidence presented both sides of the case would warrant that charge.

The Court: Okay. Your exceptions are noted for the record.

Mr. Foster: And, finally, the failure of the Court to charge the justification, use of deadly force to prevent escape arrested person in custody. And again, I feel the circumstances warrant that instruction.

*Id.* at 92. In opposition to the Defendant's reliance on *Commonwealth v. Chermansky*, 242 A.2d 237 (Pa. 1968), the Commonwealth cited the United States Supreme Court decision in *Tennessee v. Garner*, 471 U.S. 1 (1985), on the record. *Id.*

It is undisputed that a trial court has wide discretion in fashioning jury instructions. *Commonwealth v. Brown*, 911 A.2d 576, 583 (Pa. Super. 2009) citing *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006). Indeed, a trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Defendant was prejudiced by that refusal. *Id.* It is equally as clear that jury instructions are warranted for particular crimes or defenses only when the facts of a case support such an instruction. *See Commonwealth v. Browdie*, 671 A.2d 668, 673–74 (1996).

In the instant matter, Defendant suggests that the evidence at trial supported an instruction for citizen's arrest. This Court disagrees. To effectuate a "citizen's arrest", a private person must be in fresh pursuit of one who has committed felony. *Chermansky*, 242 A.2d at 239. According to *Chermansky*, the case relied on by the Defendant, if an individual successfully executes a citizen's arrest, he may employ deadly force if the

8

felon flees and cannot be arrested without killing him. However, the *Chermansky* Court was quick to warn "that before the use of deadly force is justified the private person must be in fresh pursuit of the felon and also must give notice of his purpose to arrest for the felony if the attending circumstances are themselves insufficient to warn the felon of the intention of the pursuing party to arrest him." *Id.* at 240.

Despite the Defendant's contentions to the contrary, the specific facts of the instant matter plainly do not support that a citizen's arrest instruction was warranted. Initially, the Defendant must have been "in fresh pursuit" of the felon in order to employ deadly force. On cross-examination the Defendant admitted that it was at least 15 minutes from the time Terry Fulton left the residence, possibly almost half an hour, until he located the victim. N.T. 11/18/15 at 44-45. Furthermore, the Defendant left his residence to search for the victim on at least two separate occasions. Such facts directly contradict any notion that the Defendant could be construed as being "in fresh pursuit" of the victim. Additionally, the Court finds that the fact that the victim was still on the Defendant's property at the time of the incident is of little consequences as to whether the Defendant was in fresh pursuit. This is especially true in light of the testimony at trial that strongly suggests the victim was hiding on the Defendant's property in a car following the botched robbery. *Id.* at 56. For all of these reasons, the Court finds the Defendant was not in fresh pursuit of the victim and his use of deadly force was not justified. Consequently, this Court did not abuse its discretion in refusing to charge the jury on citizen's arrest.

Assuming arguendo that the Defendant could show that he was in fresh pursuit of the victim when he employed deadly force, this Court would still find that a jury charge

9

on citizen's arrest was unwarranted. The facts of instant matter illustrate that the Defendant failed to give any notice that his purpose was to arrest the victim for the robbery in question. Moreover, the other attending circumstances surrounding the Defendant's use of deadly force were not sufficient to warn the victim that there was any intention to arrest him.

On direct, the Defendant testified that on the first sweep of his property he was going to attempt to effectuate a citizen's arrest on the victim. N.T. 11/17/15 at 192. However, he was unsuccessful in locating the victim. Yet on cross-examination the Defendant admitted that when he actually located the victim on the second sweep and pointed the gun and spotlight at him that he simply commanded the victim to stop and not to come any closer. N.T. 11/18/15 at 58. Such statements in the absence of other any facts are undoubtedly insufficient to establish that the attending circumstances were themselves sufficient to warn the victim of any intention by the Defendant to arrest him. As such, Defendant's argument on this issue would also fail for this reason. Because this Court finds that the facts of this case did not warrant a jury instruction for citizen's arrest we need not address Defendant's second and third issues.

## II. Cross-Examination of Commonwealth's Witnesses

### A. Darius Spoonhour

#### 1. Terms of the Plea Deal with Commonwealth

In his fourth issue, Defendant argues that this Court abused its discretion when it unreasonably restricted the cross-examination of Darius Spoonhour. Specifically, the Defendant avers that his cross-examination of Spoonhour was unreasonably restricted as to the terms of the deal Spoonhour entered into with the Commonwealth. Defendant also

10

argues that he was unreasonably restricted in cross-examining Spoonhour on the fact that "he gave his own gun to a convicted felon." In concluding, Defendant alleges that cross-examination on these issues was critical to challenging Spoonhour's credibility.

However, the record clearly contradicts the Defendant's contentions that his cross-examination of Spoonhour was unreasonably restricted in any manner. Following the incident in question, Darius Spoonhour was originally charged with second degree murder,[3] aggravated assault,[4] robbery,[5] criminal conspiracy to commit robbery[6] and criminal conspiracy to commit assault.[7] However, the second degree murder charge was subsequently withdrawn by the Commonwealth pursuant to Pa.R.Crim.P. Rule 561. The record indicates that this was likely due to the weakness of the legal theory of this charge and its relationship to the acts committed by Spoonhour during the incident. Ultimately, Spoonhour reached a plea agreement with the Commonwealth. On April 8, 2015, he pled guilty to conspiracy to commit robbery and the agreed upon sentence of 42 to 84 months' incarceration in a State Correctional Institution was imposed by this Court.

At trial, Spoonhour was called by the Commonwealth to testify. Regarding the specifics of his plea agreement and agreed upon sentence with the Commonwealth, Spoonhour testified:

> Q. Did you subsequently arrive at a plea agreement
> with the District Attorney's office?
>
> A. Yes.
>
> Q. What did you plead guilty to?

---

[3] 18 § 2502 §§B.
[4] 18 § 2702 §§A1.
[5] 18 § 3701 §§A1I.
[6] 18 § 903 §§C.
[7] 18 § 903 §§C.

11

A. Conspiracy of robbery.

Q. Was there an agreed upon sentence?

A. Yes.

**Q. What is your sentence?**

**A. Three and a half to seven years.**

**Q. Or conspiracy to commit robbery?**

**A. Yes.**

Q. Was there, at the time the plea agreement was entered, any consideration for your future testimony?

A. No.

Q. Had there been any discussion as to your future testimony?

A. I was just asked if I'd cooperate later on, if I was asked.

Q. I'm sorry?

A. I was asked if I would cooperate, if I was asked to.

Q. You were a asked to cooperate, if you were asked to? Is that—

A. Like, if I was asked to testify, I said I was willing to.

Q. Okay. But, was there any trade off for that?

A. No.

Q. So, you entered into your sentence without any requirement that you do anything in return?

A. Correct.

(emphasis added). N.T. 11/16/15 at 191.

Understandably, the Defendant sought to cross-examine Spoonhour regarding the nature of his plea agreement and his agreed upon sentence with the Commonwealth in attempt to explore bias and interested. After Spoonhour testified that he was not concerned about the murder charge because his lawyer had informed him it would very likely be dropped he stated the following on cross-examination:

> Q. Were you--also had four other charges that carried up to 20 years each; correct?
>
> A. Correct.
>
> Q. And, you got a pretty good deal. Do you agree with that?
>
> A. My opinion—
>
> Commonwealth: Objection as to the characterization of a great deal.
>
> COURT: **The record reflects what the agreement was. The objection is sustained.**

(emphasis added). *Id.* at 219-220. The Defendant then indicated that this was the only "deal" he was offered and he was happy with it. *Id.* at 220. Next, the Defendant again acknowledged on the record that he pled guilty to conspiracy to commit robbery and further testified:

> Q. Correct. The prosecution **agreed to drop the other charges** . . . right?
>
> A. Yes.
>
> Q. The Commonwealth agreed that **they would not file felony murder charges against you**; correct?
>
> A. Correct.

13

Q. And, the defendant will cooperate as a witness, **if called to testify?**

A. Correct.

. . .

Q. From a potential mandatory life sentence for murder, plus a maximum of 20 years each, on the other 4 counts, you pled to 3 and a half to 7 years; correct?

. . .

A. Due to my criminal record, which I had a gravity score of 0, I didn't believe it would go up to 20 years. I was looking on the lower end of the scale.

Q. Okay. And of course, in cooperating as a witness, which is the required number 4, that meant testifying here today against Mickle Shaffer, didn't it?

A. Yes.

*Id.* at 220-221.

It was at this point that the Defendant repeatedly asked Spoonhour to speculate on whether he believed he could be paroled after three and a half years. The Commonwealth objected on the basis of speculation and the objection was sustained. The following exchange then occurred:

Mr. Foster: You're aware that the prosecution can recommend or oppose parole; correct?

Commonwealth: Objection.

The Court: Counsel, approach

(Whereupon, the following discussion was held on the record at sidebar.)

The Court: **This is a state correction**

14

**sentence. That's under the jurisdiction of the State
Board of Probation and Parole. We are not going to get
into any speculation as to when a possible parole date
may be.**

Mr. Foster: I'm pointing out—

The Court: The objection is sustained.

Mr. Foster:: Just for the record, I'm
pointing out that he is aware that the prosecution can
oppose his potential parole, so therefore he has—

The Court: It's on the record. Sustained. . .

(emphasis added). *Id.* at 223.

The record in this matter patently rejects the notion that the cross-examination of

Darius Spoonhour was unreasonably restricted in any manner, particularly regarding the

terms of his deal with the Commonwealth. The nature of the Defendant's sentence and

agreement with the Commonwealth was clearly stated multiple times on both direct and

cross. The jury was undoubtedly aware of the terms of the deal. The only aspects of the

deal that this Court appears to have restricted in anyway was Spoonhour speculating

about whether he believed it was a "good deal" and if he thought he could be paroled at

his minimum sentence of three and a half years. Allowing Spoonhour to answer such

questions when they would have been based purely on speculation would have been

improper. Spoonhour's sentence is under the jurisdiction of the Pennsylvania Board of

Probation and Parole so any answer he provided about when he might be eligible for

parole would have been highly speculative and inappropriate. For all of these reasons,

this Court finds that it did not abuse its discretion as Darius Spoonhour was not

unreasonably restricted during cross-examination regarding the terms of his plea deal

with the Commonwealth

15

## 2. Gave His Own Gun to a Convicted Felon

Defendant also contends in his fourth issue that this Court abused its discretion and committed reversible error when it unreasonably restricted the cross-examination of Darius Spoonhour regarding the fact that he gave his own gun to a convicted felon which was critical to challenging his credibility before the Defendant's jury. Although he fails to specify, presumably the Defendant is referring to the following exchange during cross-examination of Spoonhour where he stated:

> Q. You knew when you gave a gun to Janorris Hughes,
> you knew that he was a convicted felon and he was not
> allowed to possess firearms, didn't you?
>
> Commonwealth: Objection.
>
> The Court: Will counsel approach, please.
>
> (Whereupon, the following discussion was
> held on the record at sidebar.)
>
> The Court: Okay. Your objection, Attorney
> Rahauser?
>
> Commonwealth: There is-- the only way his
> record comes in is if there's a claim of self-defense,
> which has not been established.
>
> Mr. Foster: It will be established.
>
> Commonwealth: But it's not—
>
> Mr. Foster: Aside from that.
>
> The Court: Well, the danger is how you've—
>
> Mr. Foster: It's relevant.
>
> The Court: You've stated that in front of
> the jury by suggesting it in your question and it's not.

16

Mr. Foster: It's relevant also, to this gentlemen's--what he was facing when he was charged, because it's relevant to how he would be sentenced.

. . .

Mr. Foster: Darius Spoonhour's actions in the criminal activity to which he was charged and was entered into a plea agreement, is relevant to what his sentencing was before he entered into the plea agreement. If he would have not entered into the plea agreement and he goes before the Judge to be sentenced, the prosecution would say, Your Honor, he gave this gun to a convicted felon who was not permitted to handle a firearm. That is relevant to a sentencing—

The Court: This is a stretch here. The issue is a stretch. How is the record of the victim relevant at this point in time in the trial?

Mr. Foster: It's relevant at this point, because if he knew he was giving the gun to the convicted felon, he--that is an aggravating factor in his conduct. In the offense.

The Court: Your response?

Commonwealth: I think it's a collateral matter. I think it's totally irrelevant. I think it's totally irrelevant.

Mr. Foster: If you were arguing at his sentencing—

Commonwealth: But I'm not.

Mr. Foster: I know, because you made a plea deal.

Commonwealth: No, I don't think it would be that either.

The Court: To your relevance, the question can't be asked. I'm going to tell the jury to disregard the question that was asked and remind them that questions are not facts of evidence.

Mr. Foster: I would just site, Rule 401 the test of relevancy.

> The Court: It's not relevant at this time. We had discussions pretrial as to when the record of the victim may come into play and it was clearly stated that it was only if there was going to be a self-defense—if self-defense would be asserted.

N.T. 9/16/15 at 205-208. Notably, on the third day of trial, and after a self-defense theory had been properly established by the Defendant's own testimony, this Court permitted a stipulation of the victim's criminal record to be read to the jury.[8]

Regarding cross-examination, it is well established that a trial court has the discretion to fashion both its scope and permissible limits. *See Commonwealth v. Rivera*, 983 A.2d 1211, 1230 (Pa. 2009). A "trial judge's exercise of judgment in setting those limits will not be reversed in the absence of a clear abuse of that discretion, or an error of law." *Commonwealth v. Briggs*, 12 A.3d 291, 335 (Pa. 2011) quoting *Commonwealth v. Birch*, 616 A.2d 977, 978 (Pa. 1992). In establishing the parameters of cross-examination, a court must consider whether allowing such testimony "would be likely confuse or mislead the jury." *See General Equipment Mfrs. v. Westfield Ins. Co.*, 635 A.2d 173 (1993). Furthermore, as with all evidence, it must be relevant and not unfairly prejudicial. *See* Pa.R.E., Rule 403.

In the instant matter, this Court was well within its discretion in sustaining the Commonwealth's objection regarding the introduction of the victim's criminal record during cross-examination of Darius Spoonhour. As a self-defense claim had yet to be established, the Defendant failed to show how the victim's criminal record resulting in

---

[8] Specifically, this stipulation stated:

> This is the fact for you to accept. Janorris Hughes was convicted of a crime of criminal conspiracy to burglary in the Court of Common Pleas of Franklin County, in docket number 1321 of 2012 and was sentenced on January 16 of 2013. So, that is a fact that you will have to accept.

N.T. 9/18/15 at 76.

18

him being a person not to possess a firearm was relevant during the cross-examination of Spoonhour. Defendant argues that it was relevant because if Spoonhour knew he was giving a gun to a convicted felon this would have been an aggravating factor at the time of sentencing. The Court finds this backdoor attempt to inform the jury of the victim's criminal record for such a reason to be particularly unconvincing. Furthermore, even if this line of questioning during cross-examination would have elicited relevant information, this Court finds that its probative value would have been greatly outweighed by its potential unfair prejudice. *See* Pa.R.E., Rule 403. Consequently, we find Defendant's argument on this issue to be meritless.

### B. Attorney Stephen Kulla

Similar to his fourth issue, Defendant next asserts that this Court again abused its discretion and committed reversible error in unreasonably restricting the cross-examination of Spoonhour's attorney, especially as to the terms of his client's deal with the Commonwealth and the details of his representation. Defendant asserts this was critical to challenging Spoonhour's credibility before the jury. As highlighted previously, a trial court has the discretion to fashion both the scope and permissible limits of cross-examination. *See Rivera*, 983 A.2d at 1230.

At trial, the Commonwealth called Attorney Stephen Kulla to testify. Attorney Kulla was court-appointed to represent Darius Spoonhour after he was charged and eventually pled guilty on the aforementioned charges. On direct examination, Attorney Kulla stressed that he believed the felony murder charge was incredibly weak and had little, if any, chance of succeeding. N.T. 11/17/15 at 6. Additionally, Attorney Kulla detailed the discussions he had with Spoonhour regarding the other charges and the

19

potential penalties for them. *Id.* at 6-10. Discussion of these penalties included explaining to Spoonhour the possible maximum sentence on each charge as well as the guideline sentences the court could have potentially considered at sentencing. *Id.* Attorney Kulla also explained the sentencing matrix to the jury as it related to the charges Spoonhour originally faced and testified that he also did this with Spoonhour previously. *Id.* at 13. Finally, Attorney Kulla detailed the specifics of the plea agreement which Spoonhour ultimately accepted. This included that the Commonwealth would drop all of the other charges, including not pursuing a felony murder charge, and that Spoonhour would cooperate and testify truthfully if called to do so regarding this incident. *Id.* at 16.

In response, Attorney Kulla was exhaustively cross-examined about the terms of the plea agreement accepted by Spoonhour and the potential penalties he could have faced for the crimes he was originally charged with. In fact, the cross-examination of Attorney Kulla lasted for roughly 28 pages of trial transcript. *Id.* at 18-46. Attorney Kulla was asked to detail the possible maximum sentence and the aggravated sentence on each of the charges Spoonhour faced. *Id.* at 35-40. Trial Counsel for the Defendant also explored the possibility that a court could have imposed consecutive sentences for the original charges if a plea agreement had not been reached and Spoonhour was convicted. *Id.* at 40-41. The record in this case clearly illustrates that trial counsel was given wide latitude in cross-examining Attorney Kulla about the terms of the plea agreement and the potential sentences the charges brought against Spoonhour could have resulted in. As such, we find Defendant's contention on this issue to be wholly without merit.

Additionally, Defendant contends that this Court unreasonably restricted the cross-examination of Attorney Kulla regarding "the details of his representation of

20

Spoonhour at Defendant's trial" which was critical to challenging Spoonhour's credibility at trial. It appears that the Defendant is referring to the following exchange near the end of cross-examination of Attorney Kulla:

> Q. But, you were hear [sic] in Court yesterday arguing about my cross examination of Spoonhour?
>
> A. No, I was not.
>
> Commonwealth: Objection.
>
> The Court : Counsel, approach please.
>
> (Whereupon, the following discussion was held on the record at sidebar.)
>
> The Court: Mr. Foster, you are getting beyond that. I'm concerned about being on the verge here of a mistrial. You trying to bring in other information, okay.
>
> Mr. Foster: That's not even close.
>
> The Court: Of what you are bringing in, causing difficulties for this trial. Okay. So, you are not going to explore what Mr. Kulla's role was here yesterday.
>
> Mr. Foster: He testified on direct that after the deal, Spoonhour was no longer in jeopardy from these charges and yet yesterday he came into the Court and said he's concerned.
>
> Commonwealth: But, that was on sidebar.
>
> Mr. Foster: About this incident, bringing a gun to a known felon.
>
> Commonwealth: That's speculative to things that have not been testified, that may or not be proven and are not part of this case.
> The Court: And the point that was just made, that was a sidebar discussion, not in front of the jury.
>
> Mr. Foster: Because I was examining him on

21

his statement that Mr.--that he not be involved in anything further, because Spoonhour was no longer—

The Court: But, what's the relevance in—

Mr. Foster: But, it's not true. I'm cross examining him. His involvement was no longer necessary because the witness was no longer in jeopardy after—

The Court: You are getting out of collateral matters, not issues relating to this trial.

Mr. Foster: I'm cross examining him.

The Court: I understand. You are challenging the credibility of Attorney Kulla?

Mr. Foster: Yes.

The Court: That's what you are saying. Okay. But, then we are not going to be getting into a whole collateral matter.

Mr. Foster: He's a witness called by the prosecution.

The Court: I understand your position. I've made my ruling. Please move on.

N.T. 9/17/15 at 43-45. Trial Counsel's attempt to cross-examine Attorney Kulla regarding a side bar discussion he participated in while Spoonhour was testifying the previous day was improper as it required the jury to speculate about facts that had not been properly before it or established in the case. Such information was a collateral matter and beyond the scope of cross-examination. Consequently, limiting trial counsel's cross-examination of Attorney Kulla was well within this Court's discretion and the Defendant's argument is without merit.

22

## III.    Defendant Testifying

In his sixth issue, Defendant argues that this Court "effectively compelled" him to testify against his own desires because the Court previously ruled that there was insufficient evidence presented in the Commonwealth's case to warrant a self-defense instruction to the jury. Initially, this Court would note that an extensive colloquy of the Defendant was conducted after the Commonwealth rested regarding the Defendant's decision to testify. The details of this colloquy were stated on the record:

> The Court: Mr. Shaffer, we are at the point in the trial where the Commonwealth has concluded its presentation of evidence and now it's your decision to decide whether you wish to present any evidence whatsoever and **specifically whether you wish to testify**. You've heard me give instructions to the jurors, that if you chose not to testify, they cannot hold that against you or make any adverse inference from the fact that you choose not to testify. If you do it [sic] testify, they will be told to evaluate the credibility of your testimony as they would any other witness, but also be able to take into consideration that you are the defendant in this case and vital interest in the outcome of the trial. Now, have you had time to talk with your attorney about your decision as to whether you wish to testify or not?
>
> A.  Yes, I have.
>
> Q.  Do you understand that if you choose to testify, that you would be subject to cross examination by the Commonwealth?
>
> A.  Yes.
>
> Q.  And, do you understand that if there is anything in your past, by way of crimen falsi, types crimes they could be brought forward in front of the jury; do understand that?
>
> A.  Yes, Ma'am.
>
> Q.  Okay. Do you have any questions at this time of your attorney regarding your right to testify?

23

A. No, Ma'am.

Q. Do you have any questions of me regarding your right to testify?

A. No, Ma'am.

Q. Do you understand that it is your decision to make and not the decision of your attorney to make as to whether you testify or not?

A. Absolutely.

Q. And, what is your decision?

**A. Since I'm not going to be able to take the self-defense without giving my testimony, then I have no choice but to testify.**

**Q. Well, I want to clarify something for you. I made a ruling on a request of your attorney to present evidence of two witnesses that would have to first satisfy requirements that self-defense was justified at this point. I've made a legal ruling that it has not. I believe you are saying that might affect [sic] your decision, but you understand that if you choose to testify, then all of the attachments that I just told you about, including cross examination and information regarding your past, will come forward as well?**

A. Yes.

(emphasis added). N.T. 11/17/15 at 148-150.

The record in this case clearly illustrates that the Defendant was not "effectively compelled to testify" and instead freely chose to do so knowing its risks and benefits. It appears that the Defendant would simply have preferred not to testify and yet still receive a self-defense instruction. Prior to his colloquy, the Defendant argued that he was entitled to a self-defense instruction based on evidence presented by the Commonwealth, most notably the testimony of Daniel Eshelman and Darius Spoonhour. *See Id.* at 136-138. The

24

Defendant is correct that evidence to support a self-defense instruction "may be adduced by the defendant as part of his case, or, conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination." *See Commonwealth v. Rose*, 321 A.2d 880, 885 (Pa. 1974). However, such evidence from whatever source must speak to the three elements for a claim of self-defense to be placed in issue for the jury's consideration. These three elements are:

    a)  the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying

    b)  the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, and that there was a necessity to use force in order to save himself therefrom

    c)  the slayer did not violate any duty to retreat or to avoid the danger.

*Commonwealth v. Myrick*, 360 A.2d 598 (Pa.1976); *Commonwealth v. Cropper*, 345 A.2d 645 (Pa.1975).

In the instant matter, this Court found that the Defendant was not entitled to a jury instruction for self-defense following the Commonwealth's evidence because he failed to prove the second element. N.T. 11/17/15 at 146-147. Specifically, the Court found that the testimony of Daniel Eshelman and Darius Spoonhour did not illustrate or provide any words or actions by the Defendant that would show that the Defendant reasonably believed that he was imminent danger of death or great bodily harm at the time of the incident. *Id.* at 147. Consequently, without such evidence a self-defense instruction was not warranted.

More importantly, a jury instruction for self-defense was given at trial following the Defendant's testimony. It appears to this Court that by testifying and subsequently

25

receiving the instruction, the Defendant has waived his ability to dispute the aforementioned legal ruling. Defendant seeks to avoid such an equitable and logical conclusion by alleging that he was somehow "compelled" by this Court to testify. The record definitively indicates that was not the case in this matter. As such, this Court finds Defendant's argument on this issue to be without merit.

## IV.    Request for Victim's Parole Officer to Testify

Next, Defendant asserts that this Court wrongly excluded his request to have information from the Pennsylvania Board of Probation and Parole presented to the jury to show that the victim was on parole at the time of burglary which Defendant asserts was critical evidence for the jury to consider when weighing Defendant's self-defense claims. Defendant alleges that this was critical to the jury's determination of whether the victim was the aggressor and thereby would have bolstered the Defendant's assertion that he was reasonably in fear of death or serious bodily injury when he shot the victim.

On the second day of trial, the Defendant requested that he be able to offer the testimony of Michael Riess, the victim's Pennsylvania State Probation and Parole agent. N.T. 11/17/15 at 134. Defendant stated that Mr. Riess would testify that at the time of the victim's death he was on parole for a conviction of conspiracy to commit robbery and was paroled to a halfway house in Chambersburg, Pennsylvania in 2013. *Id*. Additionally, Defendant asserted that Mr. Riess would testify that part of the conditions of the victim's parole were that he was not to possess firearms or engage in criminal activity. The Defendant sought to offer this as relevant evidence in support of the issue as to who was the initial aggressor. If the victim knew he was facing parole revocation as a result of the

26

home invasion with a firearm, this would have impacted his state of mind and made it more likely he was the aggressor in the final encounter argues the Defendant. *Id.* at 135.

The Commonwealth objected to the introduction of this evidence. *Id.* Although the Commonwealth conceded that if self-defense was established by the Defendant the victim's criminal record could be introduced as evidence of who was the initial aggressor, it argued that the parole status of the victim was irrelevant and a collateral matter and was therefore, inadmissible. *Id.* at 136. Notably, the criminal record of the Defendant was read into the record at trial. N.T. 11/18/15 at 76.

This Court again fails to see how such evidence was relevant and would agree with the Commonwealth that what was proper in this case was the introduction of the victim's criminal record as evidence supporting who was the initial aggressor. The victim's parole status was a collateral matter. Additionally, the Court believes the Defendant cannot show he was prejudiced on this issue. For these reasons, this Court did not err when it excluded the Defendant's request to have the victim's Pennsylvania State Probation and Parole agent testify to the conditions of his parole.

## V.    Sentencing Discretion

In his final issue, Defendant argues that this Court abused its discretion when it sentenced him to 20 to 40 years' incarceration for his third-degree murder conviction. Defendant contends this was "too harsh" a punishment and was excessive under the circumstances of this case. Finally, Defendant avers that this Court failed to consider important mitigating factors and instead relied exclusively on the severity of the offense which was a violation of the sentencing code.

27

At sentencing, the Defendant standard guideline range for his conviction for third-degree murder was 186 months to 240 months. This Court sentenced the Defendant to 20 to 40 years' incarceration. It is undisputed that the sentencing court must consider Pennsylvania's sentencing guidelines. These guidelines are outlined in 42 Pa. C.S. § 9721 which state in pertinent part:

> (b) General standards.--In selecting from the alternatives set forth in subsection (a), the court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant. The court shall also consider any guidelines for sentencing and resentencing adopted by the Pennsylvania Commission on Sentencing and taking effect under section 2155 . . . In every case in which the court imposes a sentence for a felony. . . the court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed.

Defendant argues that in imposing the maximum sentence of 20 to 40 years' incarceration, this Court violated the Sentencing Code because such a sentence is not consist with the protection of the public or the gravity of the offense as it relates to the impact on the life of the victim and the community. Furthermore, Defendant avers that such a sentence is manifestly inconsistent with his rehabilitative needs.

Defendant's claims are challenges to the discretionary aspects of his sentence. *See Commonwealth v. Boyer*, 856 A.2d 149, 151 (Pa. Super. 2004); *Commonwealth v. McAfee*, 849 A.2d 270, 275 (Pa. Super. 2004). The trial court is afforded "great deference as it is the sentencing judge that is in the best position to view the defendant's character, displays of remorse, defiance, or indifference, and the overall effect and nature of the crime." *Commonwealth v. Allen*, 24 A.3d 1058, 1065 (Pa. Super. 2011). A

28

sentencing court must "follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." *Mouzon*, 812 A.2d at 620 (citations omitted); 42 Pa.C.S.A. § 9721(b). "The sentencing court, however, must also consider the sentencing guidelines." *Commonwealth v. Hardy*, 939 A.2d 974, 980 (Pa. Super. 2007) (citation omitted). Most importantly, because the Defendant's sentence was within the standard range, he must demonstrate that the "application of the guidelines [was] clearly unreasonable" pursuant to 42 Pa.C.S.A. § 9781(c)(2).

In the instant matter the Defendant had a prior record score of 4 and using the Deadly Weapon-Used Matrix[9] his conviction had an offense gravity score of 14 making the standard guideline range 186 months to 240 months. Defendant also notes that the mitigated range was 174 months to 240 months. The Court had the opportunity to diligently and properly review a pre-sentence report prior to sentencing. This Court explained the reasons behind its sentence on the record, stating:

> The Court: It is accurate that the Court must consider four things in determining what the appropriate sentence would be. I've outlined what the sentencing guidelines provide. That's a standard range for this Court to begin its analysis.
>
> I also have to consider matters involving protection of the public, gravity of the offense, and your rehabilitative needs. I want to start with the gravity of the offense. There can be no offense more grave than taking the life of another.
>
> . . .

---

[9] 204 Pa. Code § 303.17(b).

So this is the most serious offense for which someone stands before a court for purposes of being sentenced.

Go to protection of the public next. The evidence as presented at trial revealed that you had many opportunities to change the course of events of that evening. I'm aware of the assault that took place within your home before your conduct by choice in ending the life of Mr. Hughes.

I'm aware of the intervening period of time, the lack of attempt to obtain help from law enforcement, and your assertion of justification at the time of trial for the murder that you committed.

. . .

This Court agrees with the jury's verdict finding that your acts were not justified. So I have considered protection of the public as being very high in determining what your minimum sentence should be because you have asserted a need to act the way that you did, that you were justified. And I reject that as did the jury.

And then the last factor, your rehabilitative needs, which is really a puzzle to the Court. It's very difficult to rehabilitate with no acknowledgment of responsibility. I'm not sure what will be done for you by way of rehabilitation while in the state correctional institution system. But I am sure that that's [sic] where you need to be because of the choices that you made.

N.T. 12/9/15 at 12-14.

Thus, the record clearly rejects the Defendant's claim that this Court relied exclusively on the severity of the offense in arriving at the Defendant's sentence. To the contrary, this Court specified that it considered protection from the public to be an instrumental factor in determining what the Defendant's minimum sentence should be. Finally, the Court noted the questions associated with resolving what the Defendant's rehabilitative needs are in light of his refusal to acknowledge responsibility for his actions. Review of the applicable record and statutory authority definitively shows that

30

this Court properly applied the guidelines in question when arriving at the Defendant's sentence which was within the standard range. For all of these reasons, Defendant's final claim is meritless.

## CONCLUSION

In light of the foregoing reasons, the Court did not abuse its discretion by imposing a sentence of 20 to 40 years' incarceration in a State Correctional Institution. Furthermore, this Court did not abuse its discretion in refusing to charge the jury on citizen's arrest, the use of deadly force to prevent the escape of a fleeing felon or an arrested person in custody. Additionally, the Defendant was not unreasonably restricted in his ability to cross-examine Darius Spoonhour or his attorney Stephen Kulla. Finally, the Court did not wrongfully exclude Defendant's request to have the victim's probation and parole agent testify and the Defendant was not "compelled" to testify in anyway by this Court. For all the reasons stated herein, this Court respectfully requests that the Superior Court dismiss the appeal of the Defendant.